| IN RE: SUBPOENA DUCES | * | NO. 2021-CA-0010 |
| TECUM ISSUED BY THE | | |
| INSPECTOR GENERAL OF | * | |
| THE CITY OF NEW ORLEANS | | COURT OF APPEAL |
| TO DUPLANTIER, | * | |
| HRAPMANN, HOGAN & | | FOURTH CIRCUIT |
| MAHER, SUBPOENA NO. 1- | * | |
| AD/20-0002 | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2020-04424, DIVISION "D"
Honorable Nakisha Ervin-Knott, Judge
* * * * * *
**JAMES F. MCKAY III**
**CHIEF JUDGE**
* * * * * *

(Court composed of Chief Judge James F. McKay III, Judge Edwin A. Lombard, Judge Sandra Cabrina Jenkins)

DOUGLAS L. GRUNDMEYER
WALTER F. BECKER, JR.
CHAFFE McCALL, L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, Louisiana 70163
     COUNSEL FOR APPELLEE/CITY OF NEW ORLEANS
     INSPECTION GENERAL

BENJAMIN M. CHAPMAN
MILLING BENSON WOODWARD, LLP
6421 Perkins Road, Building B, Suite B
Baton Rouge, Louisiana 70808
-and-
JUAN L. LIZARRAGH
MILLING BENSON WOODWARD LLP
909 Poydras Street, Suite 2300
Suite 2300
New Orleans, Louisiana 70112
     COUNSEL FOR APPELLANT/THE ORLEANS PARISH
     COMMUNICATION DISTRICT

**AFFIRMED**

**AUGUST 4, 2O21**

In this case, which arises out of an ongoing financial audit and investigation of the Orleans Parish Communications District (OPCD) by the New Orleans Office of Inspector General (OIG), the OPCD appeals the trial court's judgment granting the OIG's motion to compel discovery pursuant to an administrative subpoena duces tecum and request for documents issued by the OIG as well as denying the OPCD's motion to quash. For the reasons that follow, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Pursuant to Act 155 of the 1982 Regular Session, the Louisiana Legislature created the OPCD for the purpose of providing "a single, primary three-digit emergency number through which public service efforts can be quickly and efficiently obtained. . . for use in Orleans Parish." The Act provided for the OPCD to have a seven-member board of commissioners, which must include the Superintendent of the New Orleans Police Department, the Superintendent of the New Orleans Fire Department, the Director of the New Orleans Health Department, the Director of the Office of Civil Defense for the City of New

1

Orleans, as well as "two at large members to be appointed by the mayor if needed to assure minority representation." The Act further provided that each member may appoint and revoke a person to serve in his stead and that the OPCD commission could by majority vote increase its membership "by adding additional agencies." The OPCD now consists of eleven members.

Act 155 also required the OPCD's commission to "submit its annual budget to the New Orleans City Council for its approval." The Act further provided for the OPCD's funding from an Orleans Parish voter approved emergency telephone tax levied and collected by the Council of the City of New Orleans, as well as the right to receive "federal, state, parish, or municipal funds as well as funds from private sources" to accomplish the Act's purposes.

The original Act was amended by Act 897 of the 1990 Regular Session to authorize the OPCD to issue bonds that were "solely the obligations of the district and not the state of Louisiana." The original Act was amended again by Act 726 of the 1995 Regular Session to provide for the OPDC to levy an emergency telephone service charge with Orleans Parish voter approval in an election called by the New Orleans City Council.

In 2016 and 2019, the City and the OPCD entered into cooperative endeavor agreements to consolidate their personnel and functions in a joint effort to improve the 911 call system and services. The stated purpose of their arrangement is to engage in "cooperative financing" and "joint planning and implementation of public works" through a "concept of consolidation . . . defined as the physical and

organizational placement of all emergency communications functions into one facility as one organization supporting NOPD, NOFD, NOEMS, and New Orleans Homeland Security and Emergency Preparedness using common systems." The Cooperative Endeavor Agreement refers to the OPCD's operations employees, who are funded directly by the City, as "OPS" employees as distinguished from the OPCD's administrative, facility, and technology or "AFT" employees, whom the City does not fund directly.

The current Cooperative Endeavor Agreement between the City and the OPCD, which is effective from January 1, 2019 through December 31, 2023, provides for joint funding under the consolidation arrangement. Under the agreement, the City itself appropriates substantial City funds to the OPCD for the costs of the 911 operations. In addition to its annual appropriation to the OPCD, the City must afford the OPCD's full time employees with options to participate in the City's medical plan and retirement system and special access to programs and benefits afforded City employees. The City also provides the OPCD with access to City fueling stations, as well as the City's computer system, software applications, and internet and intranet systems. The City further provides the services of the City's Medical Director to consult with and advise the OPCD on medical issues, including compliance with policies, standards, and protocols issued by the NOEMS, NOFD, and NOPD governing emergency medical dispatch, to advise on quality improvement and risk management activities related to the OPCD's performance of medical services and medical priority dispatch, to provide medical

control and accountability within the OPCD, and to consult on the OPCD's medical training programs and evaluation, among other tasks. Finally, the City also furnishes the OPCD with liaison officers of supervisory rank from City departments to work with the OPCD to ensure that OPCD's operations personnel and supervisory staff adhere to the OPCD's policies and procedures.

Under the Agreement, the OPCD also owes the City numerous obligations, including developing and implementing standard operating procedures derived from the policies and procedures of the NOPD, the NOFD, and NOEMS. The OPCD must develop an administrative and organizational structure that ensures consolidated operations maintaining and improving the operational performance of 911 services for the City. The OPCD must also work "with the City and other agencies to develop projects to help fulfill the missions of the City, the OPCD, NOPD, NOFD, NOEMS, to provide 9-1-1, non-emergency, and 3-1-1 services to the citizens of Orleans Parish." Both the OPCD and the City must report to each other on other performance standards of the 911 system and their respective obligations.

Consistent with the Cooperative Endeavor Agreement, Generally Accepted Accounting Standards (GAAP), and the statements of the Governmental Accounting Board, the City has included financial statements of the OPCD as a "component unit" in the City's audited comprehensive annual financial report. In the OPCD's own annual financial report for 2018 and 2017, the OPCD likewise refers to itself as "A Component Unit of the City of New Orleans, Louisiana" and

4

states in the "Financial Highlights" section of its report that "[d]uring 2018 and 2017, the District received $9,476,774 and $9,476,778, respectively, from the City of New Orleans to fund operations of the 9-1-1 System in conjunction with the Cooperative Endeavor Agreement."

Duplantier, Hrapman, Hogan & Maher, LLP (DHHP), in its independent auditor's report of June 24, 2019, found numerous significant deficiencies with material weakness in the OPCD's finances in 2017 and 2018 that it was required to report under Generally Accepted Government Auditing Standards.

In 2018, those errors included incorrect postings made to the OPCD's general ledger concerning cash and revenue, payroll accrual, retirement contribution liability, customer accounts, accounts payable, and vendor disbursements. DHHM's audit of the OPCD noted incorrect cash reconciliations, "missing checks," incorrect posting of cash transactions, understated cash, accrued wages, and payroll tax liabilities, and voided checks. DHHM also noted significant deficiencies in the OPCD's accounting of employees' accrued annual and sick leave, including improper accrual of leave to certain employees "redirected from OPS to AFT," who appear to be improperly classified in the payroll system, and manual adjustments made to employees' accumulated leave balances that lacked written support and that the OPCD personnel could not explain.

In 2017, DHHM similarly found several significant deficiencies in the OPCD's general ledger and cash accounts. In its audit of the OPCD's payroll

system, DHHM found numerous errors, including the OPCD's inaccurate reporting of wages and related payroll tax liabilities, improper support for approval of sick leave, annual leave, and leave without pay, improper reporting of salaries and related expenses, undocumented daily leave and attendance, lack of management approval of leave, and employee pay rates with no documentary support, which could result in the over-payment or underpayment of wages. There were also multiple credit card disbursements that management did not review or approve, receipts that did not denote the business or public purpose of the transaction, charges without receipts, and a violation of La. Const. art. VII § 14, which prohibits loans, pledges, or donations of public property, as well as deficiencies concerning the OPCD's fixed assets, including improper depreciation, overstated net book value, assets lacking initial cost and date of purchase information, and assets disposed of with no written purpose.

Certain memoranda and email correspondence of City officials and OPCD board members documented the OPCD's administrative and financial management problems described above. Further, the OPCD's responses to the OIG's risk assessment questionnaires in 2018-2019 raised additional concerns. As a result of these concerns, the OIG began an investigation and audit of the OPCD.[1]

---

[1] The New Orleans City Code Section 2-1120(10)(a), which authorizes the OIG to inspect the records of persons with "agreements" and "other programmatic and financial arrangements undertaken by city government." Section 2-1120(12)(a) of the City Code gives the OIG "access to all records" of any "organization involved in any financial capacity or official capacity with city government that the inspector general deems necessary to facilitate an investigation, audit, inspection, or performance review."

La. R.S. 33:9613(D)(1), which authorizes the OIG to investigate and examine all "entities of the local governmental subdivision or entities receiving funds through or for the benefit of the local governmental subdivision." La. R.S. 33:9613(E) defines a "quasi public agency or body" as "[a]n organization … that is a component unit of local government established to perform a

6

On May 7, 2020, the OIG served an administrative subpoena duces tecum upon DHHM requesting financial records pertaining to DHHM's client, the OPCD. The OIG forwarded correspondence to the OPCD requesting similar financial records on May 18, 2020.  In response to the administrative duces tecum, DHHM filed a motion for protective order on June 4, 2020.  The OPCD joined in DHHM's request and likewise filed a motion to quash subpoena duces tecum and for protective order on June 8, 2020.  On June 15, 2020, the OIG filed a consolidated response to motion for protective order and motion for orders compelling compliance and on August 21, 2020, filed a first addition and supplement to memorandum in support of opposition to motion for protective order (hereinafter collectively "motions to compel").

The trial court held a hearing on DHHM's motion for protective order, the OPCD's motion to quash, and the OIG's motions to compel on September 29, 2020.  Following the hearing, the trial court granted DHHM's motion for protective order, and granted in part and denied in part the OPCD's motion to quash and the OIG's motion to compel.  It is from this judgment that the OPCD appeals.[2]

---

public purpose, and created by the state of Louisiana or any political subdivision or agency thereof or any special district or authority operating within the municipality."

[2] On October 28, 2020, the OPCD timely filed a motion for suspensive appeal, which was signed by order dated November 10, 2020.  Then, on November 9, 2020, the OPCD timely filed an amended motion for suspensive appeal to correct typographical errors contained in the motion for suspensive appeal, which was signed by order dated December 3, 2020.

**DISCUSSION**

On appeal, the OPCD raises the following assignments of error: (1) the trial court erred in holding that the OPCD is a component unit of the City of New Orleans; (2) the trial court erred in holding that the OPCD is a quasi-public agency or body; (3) the trial court erred in holding that the New Orleans mayor appoints a majority of the OPCD board of commissioners; (4) the trial court erred in holding that the New Orleans OIG has oversight over the OPCD; (5) the trial court erred in granting in part the New Orleans OIG's consolidated response to motion for protective order and motion for orders compelling compliance and first addition and supplement to memorandum in support of opposition to motion for protective order; and (6) the trial court erred in denying in part the OPCD's motion to quash subpoena duces tecum and for protective order.

In its first assignment of error, the OPCD contends that the trial court erred in holding that it was a component unit of the City of New Orleans. This contention almost seems disingenuous. On the cover page of its own annual report for December 31, 2018 and 2017, the OPCD describes itself as "A component Unit of the City of New Orleans, Louisiana." In its notes to its financial report, the OPCD summarizes its "significant accounting policies" and declares, as the "reporting entity," that "[f]or financial reporting purposes the District is a component unit of the City of New Orleans, Louisiana (the City)." DHHM's auditor's report of the OPCD likewise refers to the OPCD as a component unit of the City of New Orleans." The City's comprehensive annual financial report also

8

states that the OPCD is a "discretely presented component unit" of the City as an organization "for which the City is financially accountable." It is clear from the representations that the parties considered the OPCD to be a component unit of the City of New Orleans. Accordingly, we find no error regarding the trial court's holding.

In its second assignment of error, the OPCD contends the trial court erred in holding that the OPCD is a quasi public agency or body. Based on La. R.S. 33:9613(E), the trial court found that the OPCD met the definition of a quasi public agency or body subject to the OIG's investigative and subpoena request. According to the pertinent portions (for the purposes of this case) of La. R.S. 33:9613(E), a "quasi public agency or body" is defined as:

> (1)   An organization, either not-for-profit or for profit, that is a component unit of local government established to perform a public purpose, and created by the state of Louisiana or any political subdivision or agency thereof or any special district or authority operating within the municipality.
> (2)   An organization, either not-for-profit or for profit, that is a component unit of a local governmental subdivision reporting entity, as defined under generally accepted accounting principles.
> (3)   An organization, either not-for-profit or for profit, created to perform a public purpose and having one or more of the following characteristics:
> …
> (b) A majority of the governing body is appointed by or authorized to be appointed by a governmental entity or individual governmental official as a part of their official duties.
> …
> (4)   Any not-for-profit organization operating within the municipality which receives or expends in excess of twenty-five thousand dollars in local assistance in any fiscal year. Assistance includes grants, loans, awards, transfer of property, and direct appropriations of local public funds.
> (5)   Any organization, either not-for-profit or for profit, operating within the local governmental subdivision which is subject to the

Open Meetings Law and derives a portion of its income from payments received from any local governmental subdivision agency or body.

It is clear that the OPCD fits within the definition of a quasi-public agency or body from the plain language of La. R.S. 33:9613(E). Accordingly, we find no error regarding the OPCD's second assignment of error.

In its third assignment of error, the OPCD contends that the trial court erred in holding that the New Orleans mayor appoints a majority of the OPCD's board of commissioners. Act No. 155 of the 1982 Regular Session provided that the OPCD's initial seven-member board of commissioners must include the Superintendents of the New Orleans Police and Fire Departments, the Directors of the New Orleans Health Department and Office of Civil Defense, as well as "two at large members to be appointed by the mayor if needed to assure minority representation." The Act also provided that each appointed member could appoint and revoke a person to serve in his stead and that the OCPD board by majority vote could "increase the membership of the commission by additional agencies."

The OPCD's governing board of commissioners now consists of eleven members, seven of whom the Mayor appoints: five ex-officio members s/he names as the superintendents or directors of City departments or offices (the Superintendent of the New Orleans Police Department, the Superintendent of the New Orleans Fire Department, the Director of the New Orleans Health Department, the Director of the Office of Emergency Preparedness, and the Director of the New Orleans Emergency Medical Services) and two at-large members. Under New Orleans Home Rule Charter Section 4-106(2) and 4-302(2), the Mayor, through the Chief Administrative Officer, appoints all those department heads and officials within City government. Clearly, the trial court did not err in

10

holding that the Mayor of New Orleans appoints a majority of the OPCD board of commissioners.

In its fourth assignment of error, the OPCD contends that the trial court erred in holding that the New Orleans OIG has oversight over the OPCD. For many of the same reasons discussed above, we find no error regarding the OPCD's fourth assignment of error. In addition, the OPCD mistakenly relies on *Orleans Parish Sch. Bd. v. Quatrevaux*, 13-1653 (La. App. 4 Cir. 11/7/14), 154 So.3d 612. In *Quatrevaux,* this Court held that the OIG had no authority to investigate the Orleans Parish School Board because La. Const. art. VI, § 5(G) provides that "no home rule charter or plan of government shall contain any provision affecting a school board or the offices of district attorney, sheriff, assessor, clerk of a district court or coroner, which is inconsistent with the constitution or law." Accordingly, the Constitution "protects the school board's independence from the exercise of power by the OIG." *Id.*, 13-1653, 154 So.3d at 619.

The *Quatrevaux* decision is totally inapposite to the instant case. Unlike the Orleans Parish School Board, the OPCD is not a constitutionally protected and independent office immune to the OIG's authority under the Home Rule Charter and the City Code. Unlike the facts in *Quatrevaux*, the City does appropriate City funds to the OPCD under their Cooperative Endeavor Agreement. Furthermore, under La. Const. art. VI, §§4 and 5, "a home rule charter government possesses, in affairs of local concern, powers which within its jurisdiction, are as broad as that of the state, except when limited by the constitution or its own home rule charter." *Francis v. Morial*, 455 So.2d 1168, 1171 (La. 1984). Under the plain wording of Section 9-401 of the New Orleans Home Rule Charter, the OIG has authority to investigate "entities receiving funds through the city." Under New Orleans City

11

Code section 2-1120, the OIG is authorized to investigate individuals with agreements with the City and "financial arrangements undertaken by city government." Under La. R.S. 33:9613(D)(1), the OIG has authority to investigate "all entities of the local government subdivision or entities receiving funds for the benefit of the local governmental subdivision." As such, the City is free to create the OIG and endow it with oversight powers of the OPCD.

We will address together the OPCD's fifth and sixth assignments of error, which deal with protective orders, motions to compel compliance and to quash subpoenas duces tecum. This Court reviews a district court's rulings on motions to quash and for protective orders concerning subpoena duces tecum under an abuse-of-discretion standard. *McMaster v. Union Carbide Corp.*, 19-0592 (La. App. 4 Cir. 7/18/19), 2019 WL 3243992; *Doe v. La. Bd. of Ethics*, 12-1169 c/w 12-1170, p. 2 (La. App. 4 Cir. 3/13/13), 112 So.3d 339, 341; *Thomas v. Weatherford International*, 463 So.2d 751, 753 (La. App. 4 Cir. 1985). This Court reviews the district court's findings of fact under the manifest-error standard and does not set them aside unless they are clearly wrong in light of the entire record. *Alexander v. Pellerin Marble & Granite*, 93-1698 (La. 1/14/94), 630 So.2d 706, 710.

An administrative subpoena is generally valid, the recipient must obey it, and a court will uphold and enforce it when (1) the investigation is for a lawfully authorized purpose, (2) the information sought is relevant and material to the investigation, and (3) the subpoena is limited and specific in scope so as not to be unreasonable, overly broad, or unduly burdensome. *Mary Moe, L.L.C. v. La. Bd. of Ethics*, 03-2220, pp. 10-12 (La. 4/14/04), 875 So.2d 22, 30. Under the New Orleans City Code Section 2-1120(12)(a) and (18), the OIG "shall have access to all records . . . of any . . . organization involved in any financial capacity or official

12

capacity with city government that the Inspector General deems necessary to facilitate an investigation, audit, inspection, or performance review" and has subpoena power to "require the production of any records which the Inspector General deems relevant or material" to those purposes. Under La. R.S. 33:9613(A)(4)(a), the OIG in New Orleans "may issue an administrative subpoena duces tecum to require the production of books, records, documents, or other evidence deemed relevant or material to an investigation, audit, or inspection." Under La. R.S. 33:9613(D)(1), the OIG "shall have the authority to examine" those materials "relevant to any matter under audit, investigation, inspection, or performance review."

In the instant case, the information and data that the OIG seeks from the OPCD is relevant and material to its investigation. The bank statements, reconciliations, check registers, credit card receipts and statements, payroll checks, policies, procedures, ledgers, and employee information that the OIG requested in its letters of May 18 and July 29, 2020 all concern the material deficiencies revealed in DHHM's audit report of the OPCD's finances. The OPCD has no valid ground to limit the OIG's requests to a single bank account and produce only payroll accounts and records of its OPS personnel, in light of evidence it has comingled both OPS funds and personnel with its other bank accounts and records concerning its AFT employees. The OPCD's far-ranging obligations to the City under the Cooperative Endeavor Agreement make all the requested records relevant to the OIG's audit. The OIG's requests are not unreasonable, overly broad, or burdensome. The OIG seeks targeted information and data for the three-year period spanning the OPCD's own financial report and the OIG's risk assessment. The OPCD furnished the same material to its accountant, DHHM, and

13

can easily provide it to the OIG.  Accordingly, we find no error or abuse of discretion on the part of the trial court in connection with its ordering the OPCD to produce documents requested by the OIG on May 7, 2020 and July 29, 2020.

**CONCLUSION**

The plain wording of the New Orleans Home Rule Charter, the New Orleans City Code, and La. R.S. 33:9613 all authorize the OIG to investigate the OPCD. Therefore, based on the above and foregoing reasons expressed in this opinion, we affirm the judgment of the trial court.

**AFFIRMED**